UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00060-TBR

KENNETH WATTS                                                                    Plaintiff

v.

LYON COUNTY AMBULANCE SERVICE, *et al.*                          Defendants

## MEMORANDUM OPINION

This matter is before the Court upon Defendants Lyon County Ambulance Service, Rod Murphy, Anthony Young, Steve Gilland, Lilburn Ann Denney, and John Sims' Motion for Summary Judgment. (Docket No. 54.) Plaintiff Kenneth Watts has responded, (Docket No. 58), and Defendants have replied, (Docket No. 60). This matter now is ripe for adjudication. For the reasons that follow, the Court will GRANT Defendants' Motion and enter summary judgment in their favor.

## BACKGROUND

This litigation arises from the termination of Plaintiff Kenneth Watts' employment with the Lyon County Ambulance Service (Ambulance Service). Watts was first employed by the Ambulance Service in September 2008 as a part-time paramedic. Watts became the interim Executive Director of the Ambulance Service beginning September 1, 2009, and officially became Executive Director in May 2010. As Director, Watts was responsible for the day-to-day operations of the Ambulance Service and reported directly to the Ambulance Service Board, the governing body of the Ambulance Service. The Board is comprised of five board members. At all times

pertinent to this litigation, Defendant Murphy was the Board's chairman and Defendants Young, Gilland, Denney, and Sims were members of the Board.

At the June 2, 2011, Board meeting, Gilland moved to vacate the position of Director, and Young seconded. This, in effect, terminated Watts' employment with the Ambulance Service. The Board appointed Adam Lyons to replace Watts, and Lyons officially became Executive Director on September 12, 2011.

Each of the Defendants has submitted an affidavit stating that Watts was terminated for a history of performance issues and failure to follow the Board's directives. (Docket Nos. 54-2, at 3, 7, 9; 54-3, at 4; 54-4, at 3.) Defendants cite among those issues as problems with lost Medicare reimbursement checks, problems between Watts and the company contracted to provide billing services to the Ambulance Service, a lack of timeliness and/or failure in implementing the Board's requests, Watts' not being forthcoming with the Board, and incorrectly filled out run forms. Each of these issues is summarized below.

*The Medicare checks issue*

In June 2010, the Ambulance Service moved to a different physical location. Around the end of 2010, Watts contacted Murphy regarding a Medicare form that needed to be signed immediately to ensure that Medicare would pay the Ambulance Service for certain services rendered. Medicare payments comprise approximately 60% of the Ambulance Service's income. According to Murphy, this problem arose because Watts had failed to notify the appropriate organizations of the Ambulance Service's change of address. Murphy states that after Medicare terminated its payments, it

required that any past due payments be mailed to a physical address.  Murphy further states that Watts was responsible for putting up a mailbox at the Ambulance Service's new location but still had not done so as of December 2010.  Because there was no mailbox at the physical address, the Medicare checks were returned and went missing.

Murphy says he provided Watts contact information for an individual in the office of U.S. Congressman Ed Whitfield from whom Watts could seek help in resolving the issue of the returned Medicare checks.  Watts does not recall Murphy providing him that contact but acknowledges, "He could have."  (Docket No. 54-5, at 54.)  Watts admits he never contacted this individual in an attempt to procure the missing payments.  At the February 2011 Board meeting, the Board learned that the Ambulance Service had not yet received some $90,000 in Medicare checks.  Murphy then went to Congressman Whitfield's office himself and spoke with an employee, Andrea P'Poole, who was able to resolve the issue within a few days.

*The 911 Billing issue*

The Ambulance Service contracted for billing services with a company called 911 Billing.  According to his testimony, Watts understood the Medicare check issue to be a mistake on 911 Billing's part.  Watts also states that he had issues with 911 Billing regarding what he perceived as inefficiency by 911 Billing.  Murphy says that in January 2011 Watts convinced the Board that 911 Billing was in breach of its contract with the Ambulance Service for failing to respond to Watts' inquiries and failing to provide necessary training for him.  The Board then authorized its attorney to write a letter to 911 Billing stating that the billing service was in breach of contract.

Representatives from 911 Billing attended the Board's February 2011 meeting. At that meeting, 911 Billing provided the Board a number of emails between itself and Watts. These emails showed that the billing service had provided Watts an entry log each week and had been in regular contact with Watts regarding training and other issues. These emails also indicated that the billing service had failed to receive responses from Watts to many of its communications.

According to Murphy, it became obvious to the Board that Watts had been untruthful about the billing service being in breach of contract. The Board's attorney apologized to 911 Billing, acknowledging that it was clear he and the Board had made a mistake. Murphy says that when Watts was given a chance for rebuttal at that meeting, he responded, "I am not prepared to talk right now." (Docket No. 54-6, at 4.)

Watts states that his efforts to point out 911 Billing's inefficiencies were met with anger by Murphy because of Murphy's "budding friendship and/or other relationship(s) with 911 Billing Services employee Beverly Basham Simmons." (Docket No. 58, at 2.) Watts insists that despite claiming the relationship with Simmons was "totally professional," there was more to Murphy's relationship with Simmons. (Docket No. 58, at 2-3.) Watts posits that "Murphy was able to get the other members of the Board to side with him on the issues pertaining to 911 Billing Services in order to protect the continued employment of his 'special friend' at 911 Billing Services." (Docket No. 58, at 2.)

*Other issues*

Defendants raise a number of additional issues relative to Watts' performance as Director. First, Murphy testified that after the February 2011 meeting, the Board "started looking into every aspect of what was going on," and found that the accounting service used by the Ambulance Service also was having trouble contacting Watts. (Docket No. 54-6, at 4.) Watts testified that he had a good relationship with the accounting service and "wasn't aware of any problems." (Docket No. 58-1, at 25, 27.)

Second, Murphy states that Watts, while Director, was expected to participate in emergency runs multiple times per week in order to assess the paramedics and EMTs he supervised. Contrary to this expectation, however, Murphy says that Watts "only made a handful of runs" while Director. (Docket No. 54-3, at 3.) According to Murphy, Watts was confronted sometime after the February 2011 meeting and asked how many runs he had participated in during the prior month. Murphy says that Watts responded he had been on roughly seventeen runs; the run records, however, showed that Watts had only been on one run. In his deposition, Watts acknowledged that his name would appear on a run report if he had been part of that run, but he could not recall with any specificity either the approximate or average number of runs he participated in while Director. (*See* Docket No. 54-5, at 20-21.) Watts also acknowledged that the Board came to him with complaints about the run reports. (*See* Docket No. 54-5, at 48.)

Third, after the Ambulance Service moved locations, the Board asked Watts to obtain a sign for the front of the Ambulance Service's new building. Watts acknowledged in his deposition that the Board had instructed him to obtain a sign for the new facility. (Docket No. 54-5, at 58.) Watts also conceded that despite the

Ambulance Service having moved to its new location in July 2010, he still had not obtained a sign as of June 2011.

Fourth, Murphy states that in May 2011, he arranged a training session with 911 Billing Services for the Ambulance Service's employees. Murphy says that he intended to use this training as an opportunity to get Watts and Simmons, the 911 Billing Services employee who had presented the emails at the February 2011 Board meeting, to work together. Murphy testified that Watts "shook his finger in my face and said that he was director and he was in charge." (Docket No. 54-6, at 13.) Watts characterizes this incident as an "occasion where [Murphy] was embarrassed by [Watts] in front of his special friend, which magnified his anger toward [Watts] and increased his motivation to terminate [Watts] based on his gender." (Docket No. 58, at 6.)

*Watts' claims*

In his original Complaint, Watts set forth eight claims based on the termination of his employment with the Ambulance Service:

Count 1:  sex discrimination and/or creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*;

Count 2:  unlawful discharge in violation of the False Claims Act, 31 U.S.C. § 3730;

Count 3:  sex discrimination and/or creation of a hostile work environment in violation of the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.010 *et seq.*;

Count 4:  breach of contract;

Count 5:  slander;

Count 6:  civil conspiracy;

Count 7:    tortious interference with a contract;

Count 8:    unlawful discharge in violation of Health Insurance Portability and Accountability Act (HIPAA) regulation 45 C.F.R. § 160.316.

By Order of February 12, 2013, the Court granted in part Defendants' Motion to Dismiss and dismissed original Counts 2 (unlawful discharge in violation of the False Claims Act) and 8 (unlawful discharge in violation of HIPAA regulations). (Docket No. 26.) Watts thereafter amended his Complaint to add counts for wrongful discharge in violation of public policy, a group tort of outrage/intentional infliction of emotional distress (IIED) against all Defendants, and an individual tort of outrage/IIED against Murphy. (*See* Docket No. 51.) Thus, after the Court's Order of partial dismissal and under Watts' Amended Complaint, the following claims remain:

Count 1:    sex discrimination and/or creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*;

Count 2:    sex discrimination and/or creation of a hostile work environment in violation of the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.010 *et seq.*;

Count 3:    breach of contract;

Count 4:    slander;

Count 5:    civil conspiracy;

Count 6:    tortious interference with a contract;

Count 7:    wrongful discharge in violation of public policy;

Count 8:    group tort of outrage/IIED;

Count 9:    individual tort of outrage/IIED.

The crux of the majority of Watts' claims is that Murphy solicited former Ambulance Service employees Sara Maki and Sarah Mink-Taylor to levee false sexual harassment claims against Watts in exchange for reemployment with the Ambulance Service. Watts specifically alleges that "Murphy, acting alone or in concert with one or more of the other defendants in this action, conspired to fabricate false statements relating to a purported sexual harassment claim(s) . . . to damage [Watts'] reputation and provide justification for terminating Watt's [sic] employment." (Docket No. 58, at 6-7.)

Both Maki and Mink-Taylor have been deposed in this matter. Maki was hired by the Ambulance Service as an EMT in 2007. (Docket No. 58-2, at 5.) While employed there, she worked with both Watts and Mink-Taylor. Maki was terminated at Watts' recommendation in early 2011. (Docket No. 58-2, at 5.) Mink-Taylor began working for the Ambulance Service as a paramedic in 2006. (Docket No. 58-7, at 4.) Mink-Taylor was terminated on March 14, 2011. (Docket No. 58-7, at 5.) Mink-Taylor was called back to cover one shift when the Ambulance Service was shorthanded sometime in May 2011. (Docket No. 58-7, at 5, 11.) She did not receive a higher rate of pay for this shift than she had previously earned. (Docket No. 58-7, at 7.) Mink-Taylor testified she was not called back again and was not rehired by the Ambulance Service. (Docket No. 58-7, at 5, 11.)

Maki testified that she was contacted first by Mink-Taylor, who encouraged her to "get in line with [Mink-Taylor] and a few others" and file a sexual harassment claim against Watts. (Docket No. 58-2, at 6.) Maki says she was then contacted by Bill Adams, Watts' predecessor as Director, and then by Murphy. (Docket No. 58-2, at 7.) Maki testified that Murphy told her "if [she] would just sign a couple of pieces of

paper," she could have her job back and receive higher pay than she had before. (Docket No. 58-2, at 8.) She says Murphy specifically wanted her to sign a statement saying she "had received unwanted sexual advances from [Watts] . . . [a]nd that [her] employment was conditioned on sexual favors and things like that." (Docket No. 58-2, at 8.) When Maki told Murphy that those claims were not true, she says Murphy encouraged her to lie. (Docket No. 58-2, at 8-9.) Maki's conversations with Mink-Taylor, Adams, and Murphy all took place on the same day, and she had no further conversations with any of them. Maki memorialized these conversations in a sort of diary entry. (Docket Nos. 58-2, at 10; 58-3.) Maki denied having any conversation with Defendants Young, Gilland, Denney, or Sims.

Maki repeatedly and emphatically testified that Murphy initiated the contact her by calling her:

> A. . . . I hung up the phone with [Bill Adams], and then that's when I was contacted by Rod Murphy.
> . . . .
>
> Q. Did you ever call Rod [Murphy]?
>
> A. No.
>
> Q. Have you ever called Rod [Murphy]?
>
> A. Not that I'm aware of.
>
> Q. Would you -- wouldn't you remember?
>
> A. Well, I mean, yeah, I don't -- I didn't call him.
>
> Q. You've never called him?
>
> A. Not that --
>
> Q. Yes or no?
>
> A. That would be a "no."

(Docket No. 58-2, at 7, 21.)  She subsequently clarified that she had called Murphy back later that same day and left a voicemail telling Murphy not to call her again. (Docket No. 58-2, at 24.)  Maki's phone records, however, appear to contradict this version of events.  According to those records, Maki called Murphy once on May 24, 2011.  (*See* Docket No. 54-3, at 2.)  These records do not show that Murphy called her or that she called Murphy again later that day, as she testified.

Mink-Taylor acknowledges that she called Maki on May 24, 2011, but says that the purpose of her conversation was to say that she had heard Watts was going to be terminated and to ask whether Maki was planning to attend the Ambulance Service Board meeting.  (Docket No. 58-7, at 6.)  Mink-Taylor denies either telling Maki that Watts had sexually harassed her or asking Maki if Maki had been sexually harassed by Watts.  (Docket No. 58-7, at 12.)  She also denies either asking or telling Maki to make a sexual harassment claim against Watts.  (Docket No. 58-7, at 12).

Mink-Taylor also acknowledges that she had a telephone conversation with Murphy but denies that they discussed her pursuing a sexual harassment claim against Watts.  (Docket No. 58-7, at 6-7.)  Mink-Taylor states that the purpose of her conversations with Murphy was to discuss the possibility of getting her job back at the Ambulance Service.  (Docket No. 58-7, at 6.)  She did not recall Murphy asking her any questions that would be consistent with him investigating sexual-harassment-type behavior by Watts; however, she adamantly denied that Murphy asked her to make a sexual harassment claim against Watts.  (Docket No. 58-7, at 7 ("Q. At any point did Rod Murphy ask you to consider making a sexual harassment complaint against Kenny Watts?  A. Absolutely not; no sir.").)  Mink-Taylor further denied ever agreeing to make

sexual harassment claims against Watts in exchange for reemployment. (Docket No. 58-7, at 11.)

Murphy, for his part, acknowledges that he had been called by Mink-Taylor several times about her wanting to come back to work at the Ambulance Service. (Docket No. 54-6, at 10.) Murphy also acknowledges having one telephone conversation with Maki, but testified that he did not initiate that conversation with her. (Docket No. 54-6, at 11.) Murphy denies asking Maki to make a sexual harassment claim against Watts. (Docket Nos. 54-3, at 4; 54-6, at 12.)

In addition to the claims that relate directly to his termination, Watts also alleges that after his termination Defendants published false statements about him "by telling other members of the community of the reasons for his termination." (Docket No. 58.) These slander claims appear to be directed only at Defendants Murphy and Gilland. (*See* Docket Nos. 51, at 8-9; 58, at 45-46.)

After the June 2, 2011, Board meeting, Murphy gave an interview to Bobbie Foust, a reporter for the *Herald Ledger* newspaper. (*See* Docket No. 54-3, at 43.) In that article, titled "Murphy Outlines Causes Behind Watts' Dismissal," Murphy identified several reasons for Watts' termination, including the issue with the lost Medicare checks, a lack of timeliness in implementing the Board's requests, Watts' desire to terminate the Ambulance Service's contract with 911 Billing, Watts' failure to erect a sign and mailbox after the Ambulance Service moved locations, Watts' not being forthcoming, and incorrectly filled out run forms. (Docket No. 54-3, at 43.) When asked in his deposition, "Was there anything to your mind [in the *Herald Ledger* article]

that specifically sticks out as being false?" Watts responded, "Not specifically to my mind." (Docket No. 58-1, at 41.)

In regard to Defendant Gilland, Watts alleges that Gilland made false statements about him after his termination to Richard Smith, the Lyon County Emergency Management Deputy Director, and to Brad Ritchie, a local firefighter and friend of Watts. Watts has submitted Smith's affidavit in response to Defendants' Motion for Summary Judgment; however, neither Smith nor Ritchie have been deposed.

In his affidavit, Smith states that Gilland visited him on June 5, 2011, and "began talking about the termination of [Watts], how it had upset a lot of people and about other unresolved problems associated with it such as 911 charges, Medicare issues, etc." (Docket No. 58-11, at 1.) Smith avers that "[d]uring this conversation Mr. Gilland said something to the effect of 'I don't know but I have been told that there may be some sexual harassment charges brought against Kenny Watts.'" (Docket No. 58-11, at 2.) Watts testified in his deposition that Smith called him after speaking to Gilland. (Docket No. 58-1, at 43.) Watts states that this was the first time he had heard anything about sexual harassment charges. (Docket No. 58-1, at 43.) Gilland, in his affidavit, acknowledges speaking to Smith, stating: "After Plaintiff's termination, I went to the home of [Smith] to discuss his attendance at the Board Meeting of June 2, 2011, when [Watts] was terminated. Mr. Smith had been critical of the Board at the meeting and I sought an explanation of his position." (Docket No. 54-4, at 3.) However, Gilland denies telling Smith that any Ambulance Service employees were planning on bringing sexual harassment charges against Watts. (Docket No. 54-5, at 3.)

According to Watts, Gilland made certain comments to Ritchie when Ritchie went to Gilland's barbershop. (*See* Docket No. 58-1, at 44.) Watts says that Ritchie told him that Gilland had said to Ritchie that there were sexual harassment charges but that those charges had been dropped because of Watts' termination. (Docket No. 58-1, at 44.) In his affidavit, Gilland states: "I vaguely remember Brad Ritchie being in my barbershop and asking about [Watts'] termination. I told him that there was information of which the general public was not privy supporting [Watts'] termination. I did not tell him there were sexual harassment charges against Mr. Watts that were dropped because of Mr. Watts' termination." (Docket No. 54-4, at 3.)

## JURISDICTION

United States District Courts have "federal question" jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In addition to federal question jurisdiction, district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." § 1367(a). Thus, a district court is granted jurisdiction to hear causes of action arising under state law so long as those claims "form part of the same case or controversy" giving rise to the court's federal question jurisdiction.

Although district courts are granted supplemental jurisdiction under § 1367(a), they may, in their discretion, decline to exercise that jurisdiction for the reasons listed in § 1367(c). Specifically, a district court may decline jurisdiction over a supplemental state law claim where the court "has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). The Sixth Circuit instructs that "generally, 'if the federal

claims are dismissed before trial . . . the state claims should be dismissed as well.'"

*Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993) (quoting

*Taylor v. First of Am. Bank–Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992)). When

deciding whether to decline jurisdiction under § 1367(c)(3), a district court must weigh

several factors and "should consider the interests of judicial economy and the avoidance

of multiplicity of litigation and balance those interests against needlessly deciding state

law issues." *Id.* (citing *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th

Cir. 1991)). If a district court declines jurisdiction over a supplemental state law claim,

it must dismiss the case if it was originally brought as a federal action or otherwise

remand to the state court from which it was removed.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c). "[N]ot every issue of fact or conflicting inference presents a genuine

issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.

1989). The test is whether the party bearing the burden of proof has presented a jury

question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.

1996). The plaintiff must present more than a mere scintilla of evidence in support of

his position; he must present evidence on which the trier of fact could reasonably find

for him. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "[T]he

mere existence of a colorable factual dispute will not defeat a properly supported

motion for summary judgment. A genuine dispute between the parties on an issue of

material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Still, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

Although only Count I gives rise to this Court's federal question jurisdiction, Defendants move for summary judgment on each of Watts' nine claims. The Court, therefore, will begin its discussion with Watts' Title VII claim before deciding whether to exercise supplemental jurisdiction over Watts' state law claims in Counts II – IX.

## I.      Title VII

In Count I, Watts alleges that he was subjected to unwelcome harassment because of his gender, in that the Defendants discharged and/or created a hostile work environment in violation of 42 U.S.C. § 2000e-2(a)(1) by terminating him because of false allegations of sexual harassment that were manufactured at Murphy's request. Watts claims that the other Defendants knew of this harassment but failed to promptly take corrective action by properly investigating the false claims levied by Mink-Taylor, thereby creating a hostile work environment. (Docket No. 51, at 5-6.)

Defendants argue at the outset that Watts cannot maintain Count I against the individual named Defendants. Defendants are incorrect on this point. Defendants correctly cite *Bangas v. Potter* for the proposition that "[t]he law is clear in this circuit that individual liability may not be imposed on an employee, provided that the employee himself cannot be classified as an 'employer,' under Title VII." 145 F. App'x 139, 141 (6th Cir. 2005) (citing *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997)). Title VII's definition of "employer" includes "political subdivisions." 42 U.S.C. § 2000e(a)–(b). The Ambulance Service Board is, by statute, "a political subdivision of the Commonwealth." Ky. Rev. Stat. § 65.664. Title VII's definition of employer also includes "*any agent* of such a [political subdivision]." 42 U.S.C. § 2000e(b) (emphasis added). Defendants do not dispute—indeed, Defendants argue— that the Board members are agents of the Board. (Docket No. 54-1, at 33-34.) Accordingly, the Court declines to dismiss the individual Defendants on this Count.

### A.    Hostile Work Environment

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII violation by proving that the discrimination based on sex created a hostile work environment. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (citing, *e.g.*, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986)). Title VII's protections against hostile work environments extend not only to females but also to males, such as Watts. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). This form of discrimination occurs "[w]hen the

workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams*, 187 F.3d at 560 (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "But conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive— is beyond Title VII's purview." *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Harris*, 510 U.S. at 21). Thus, to be sufficiently "severe or pervasive," (1) the conduct must be enough to create an environment that a reasonable person would find hostile or abusive, and (2) a plaintiff must subjectively regard the environment as abusive. *Stanley v. Cent. Ky. Cmty. Action Council, Inc.*, 2013 WL 3280264, at *4 (W.D. Ky. June 27, 2013) (citing *Harris*, 510 U.S. at 21). Whether an environment is hostile or abusive can be determined only by looking at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

To establish a prima facie case of discrimination based on hostile work environment, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he was subjected to harassment, either through words or actions, based on his sex; (3) the harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the employer. *E.g.*, *Gallagher v. C.H. Robinson*

*Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009); *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008).

In the Court's prior Opinion addressing Defendants' motion to dismiss, the Court expressed its reservations as to the viability of Watts' hostile work environment claim:

> The Court has substantial doubt whether Watts' allegations are sufficient to state a Title VII claim for discrimination based on hostile work environment. However, in construing the facts in the light most favorable to Watts and accepting the allegations in his Amended Complaint as true, the Court is hesitant to dismiss Watts' claim at this juncture; rather, despite considerable pause, the Court feels that additional discovery is warranted to flesh out the merits of his allegations. Accordingly, though not without hesitation, the Court will DENY the Ambulance Service's Motion to Dismiss Watts' Title VII hostile work environment claim at this time.

(Docket No. 26, at 12.)

Watts presently argues that he "was subject to unwelcome harassment because of his gender in that the Ambulance Service . . . created a hostile work environment . . . by terminating him on the basis of false accusations of sexual harassment, which were solicited and/or known by members of the Lyon County Ambulance Service Board of Directors." (Docket No. 58, at 30.) He insists that "[b]ut for the fact that he was a male, the defendants would not have contacted a former female employee to fabricate these charges." (Docket No. 58, at 30.) Watts' conclusory allegations in this regard are wholly insufficient to withstand summary judgment on his hostile work environment claim.

Watts clings to his assertion that Mink-Taylor agreed to make false sexual harassment claims against him in exchange for reemployment with the Ambulance

Service.  This assertion, however, is without evidentiary support.  There is no evidence that any such claims were ever filed by Mink-Taylor against Watts.  There similarly is no evidence that Mink-Taylor ever lodged a complaint, even informally, about Watts sexually harassing her.  Mink-Taylor testified unequivocally in her deposition that Watts never sexually harassed her and that she never asserted that he had.  (Docket No. 58-7, at 6.)  Mink-Taylor also testified that Murphy did not ask her to make a sexual harassment claim against Watts.  (Docket No. 58-7, at 7.)  Further, although she was called back for one shift, there is no evidence to suggest that Mink-Taylor was, or has been, reemployed by the Ambulance Service.

Thus, Watts' hostile work environment claim hinges on a single phone call between Murphy and Maki.  In both his deposition testimony and affidavit, Murphy denies asking Maki to make a sexual harassment claim against Watts.  (Docket Nos. 54-3, at 4; 54-6, at 12.)  Even assuming the truth of Maki's testimony to the contrary, the single conversation in which Murphy allegedly attempted to recruit Maki to make a false claim against Watts is inadequate to prove a Title VII hostile work environment claim.  This one phone call is a far cry from harassing conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment."  *See Harris*, 510 U.S. at 21; *Berryman*, 669 F.3d 714.  And, again assuming the truth of Maki's testimony, Watts has offered nothing more than conclusory assertions to show that he was subjected to harassment *based on his sex*.  Accordingly, Watts cannot satisfy the second prong necessary to maintain his hostile work environment claim.

Furthermore, Watts has offered no evidence to show that "the harassment had the effect of unreasonably interfering with [his] work performance and creating an

objectively intimidating, hostile, or offensive work environment" *See Gallagher*, 567 F.3d at 270; *Grace*, 521 F.3d at 678. By his own admission, Watts had no knowledge of Murphy's alleged solicitation of Maki or Mink-Taylor until several days after he was terminated. (*See* Docket No. 58-1, at 43.) It simply does not follow that the claimed harassing conduct could have had any effect on Watts' work performance or work environment when he was not aware of that conduct during his employment with the Ambulance Service. *See Abeita v. TransAm. Mailings, Inc.*, 159 F.3d 246, 249 n.4 (6th Cir. 1998) (dismissing as irrelevant to a hostile work environment claim testimony concerning harassing conduct about which the plaintiff was unaware during her employment); *see also Stanley*, 2013 WL 3280264, at *5 ("To be sufficiently 'severe or pervasive,' . . . a plaintiff must subjectively regard the environment as abusive.")

Therefore, in view of the totality of the circumstances at hand, the Court is satisfied that Watts' hostile work environment claim cannot withstand summary judgment. The alleged harassing conduct is limited to a single episode, was not even made directly to Watts, and was unknown to Watts until after his employment with the Ambulance Service had ended. There is no evidence that any sexual harassment claims were ever made against Watts. In sum, Watts' allegations and the evidence of record simply do not fit the mold for a Title VII hostile work environment claim.

**B.    Sex Discrimination**

The remainder of Watts' Title VII claim alleges that the Ambulance Service discriminated against him by terminating him, based on false accusations of sexual harassment, because of his role as a male supervisor. In addressing Defendants' motion

to dismiss, the Court expressed similar concern in regard to the viability of Watts' sex discrimination claim:

> Again, the Court has substantial doubt whether Watts' allegations state a viable claim of sex discrimination under Title VII. But, for the same reasons stated above in relation to his hostile work environment claim, the Court feels that some discovery is warranted to flesh out the merits of Watts' allegations. Accordingly, the Court will DENY the Ambulance Service's Motion to Dismiss Watts' Title VII sex discrimination claim at this time.

(Docket No. 26, at 13.)

To establish a prima facie case of sex discrimination under Title VII, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the job; (3) he experienced an adverse employment action; and (4) he was replaced by someone outside of the protected class. *E.g.*, *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 568 (6th Cir. 2009); *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). However, because Watts is male, the first and fourth prongs are modified under the so-called "reverse-sex discrimination" scheme. To satisfy the modified first prong, Watts must "demonstrate background circumstances [to] support the suspicion that the [Ambulance Service] is that unusual employer who discriminates against the majority." *Simpson*, 359 F. App'x at 569 (first alteration in original) (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)). And to satisfy the modified fourth prong, Watts must show that the Ambulance Service "treated differently employees who were similarly situated but were not members of the protected class" *Id.* (citing *Sutherland*, 344 F.3d at 614). Watts' disparate treatment claim fails because he can satisfy neither of these modified prongs.

First, Watts has offered no evidence to show that the Ambulance Service is that unusual employer who discriminates against men. In fact, Watts testified in his deposition that the Board did not discriminate against men.[1] Second, Watts has offered nothing to show that he was treated differently than similarly situated, nonprotected employees. The parties seem to agree that Watts was not similarly situated with any other employee. Again, Watts' own testimony undercuts any argument that he was treated differently than any other employee. More importantly, the Ambulance Service replaced Watts with another Lyons, another male. *See Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481, 487 (6th Cir. 2011) (holding that a Title VII plaintiff "cannot establish a prima facie case of discrimination because he was not 'replaced by someone outside the protected class.'" (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006))). For these reasons, the Court finds that Watts' sex discrimination claim cannot withstand summary judgment.

* * * * *

Having found that Defendants are entitled to summary judgment on Watts' Title VII claims, the Court now must now determine whether to exercise supplemental jurisdiction over Watts' remaining state law claims in Counts II through IX. Under 28

---

[1] In his deposition, Watts testified:

> Q.   . . . Did you -- do you feel like the board, as the employer or who the employees answer to, treated females more favorably than males?
> A.   No.
> Q.   Okay. While you were there and your tenure of working there as a paramedic and then as the director, did you feel that the board had a history of treating males less favorably than females?
> A.   Not that I'm aware of.
> Q.   Okay. Did you feel you were ever treated differently than a female employee in a similar situation?
> A.   No.

(Docket No. 54-5, at 38.)

U.S.C. § 1367(c), a district court may decline jurisdiction where it has dismissed the claims giving rise to its federal question jurisdiction.  As noted above, this Circuit's precedent instructs that "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."  *Landefeld*, 994 F.2d at 1182 (quoting *Taylor*, 973 F.2d at 1287).  In deciding whether to decline jurisdiction under § 1367(c)(3), the Court must consider the interests of judicial economy and the avoidance of multiplicity of litigation, and must balance those interests against this Court needlessly deciding state law issues.  *See id.*; *Aschinger*, 934 F.2d at 1412.  Discovery is now complete, and this action is approaching a trial date only a few months away.  Additionally, Watts' remaining claims do not present particularly novel questions of state law, such that this Court would needlessly intrude upon the adjudication of state law issues best reserved for the state's courts.  In weighing these considerations, the Court finds that the interests of judicial economy would best be served by this Court continuing to exercise supplemental jurisdiction over Watts' remaining state law claims. Accordingly, the Court will proceed to address Defendants' Motion for Summary Judgment as it relates to those claims.

## II.    Kentucky Civil Rights Act

Watts alleges violations of the Kentucky Civil Rights Act (KCRA), Ky. Rev. Stat. § 344.010 *et seq.*, which parallel his Title VII sex discrimination and hostile work environment claims.  Because "the general purpose of the [KCRA] is to provide a means for implementing within the state the policies embodied in Title VII," federal courts look to federal law under Title VII in construing the KCRA.  *Stanley*, 2013 WL 3280264, at \*5 (quoting *Wathen*, 115 F.3d at 403 n.5); *see also Brewer v. Gen. Drivers,*

*Warehouseman & Helpers Union 89*, 190 F. Supp. 2d 966, 974 (W.D. Ky. 2002) ("Because the Kentucky Civil Rights Act was based upon, and is virtually identical to, Title VII of the federal Civil Rights Act of 1964, courts in Kentucky have followed federal law in interpreting and applying its statute."). Watts' KCRA claims, therefore, are analyzed under the same framework as his Title VII claims. For the same reasons Defendants are entitled to summary judgment pertaining to Title VII, *see* discussion *supra* Part I, they likewise are entitled to summary judgment on Watts' KCRA claims.

## III.    Breach of Contract

Watts alleges that he had a valid contract with Defendants for his services as Director of the Ambulance Service and that Defendants breached that contract by terminating him unjustly. (*See* Docket No. 51, at 7.) Watts acknowledged in his deposition that he did not have a written employment contract. (Docket No. 54-5, at 27, 40.) Watts insists, nonetheless, that his "contract of employment is memorialized in a letter sent to the Board's accounting firm," which notified the accounting firm of Watts' May 2010 salary increase. (Docket No. 58; *see* Docket No. 58-13, at 2.)

Kentucky is an "at will" state. "Under Kentucky law, the 'terminable at will' doctrine provides that 'an employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible.'" *Osborn v. Haley*, 2008 WL 974578, at *3 (W.D. Ky. Apr. 8, 2008) (quoting *Grzyb v. Evans,* 700 S.W.2d 399, 400 (Ky. 1985)). "[I]n the absence of a clear and specific agreement to the contrary, employment for an indefinite period of time is terminable at will by either party. *Breeden v. HCA Physician Servs., Inc.*, 834 F. Supp. 2d 616, 619 (W.D. Ky. 2011) (citing *Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 491 (Ky. 1983);

*Prod. Oil Co. v. Johnson*, 313 S.W.2d 411, 413 (Ky. 1958)); *see also Wells v. Huish Detergents, Inc.*, 1999 WL 33603335, at *2 (W.D. Ky. Nov. 30, 1999) ("Under Kentucky law, parties can alter an at-will employment contract only with a clear statement of their intent to do so."); *McNutt v. Mediplex of Ky., Inc.*, 838 F. Supp. 419, 421-22 (W.D. Ky. 1993) (recognizing "that absent a clear statement not to terminate without cause, the assumption is that the parties intended to enter into an ordinary employment relationship, terminable at the will of either party").

Watts acknowledged several times in his deposition that he fully understood he was an at-will employee. (Docket No. 54-5, at 19, 41-42.) He also testified that he felt he could quit at any time. (Docket No. 54-5, at 43.) There is no "clear and specific agreement" stating that Watts' employment was anything other than at will. Thus, the Court concludes that Watts was an at-will employee when he served as Director of the Ambulance Service. As an at-will employee, the Ambulance Service was entitled to terminate Watts for good cause or for no cause at all.

Still, Kentucky courts recognize a public policy exception to the terminable-at-will doctrine where the employee's termination "is contrary to a fundamental and well-defined public policy . . . evidenced by a constitutional or statutory provision." *Osborn*, 2008 WL 974578, at *3 (quoting *Grzyb*, 700 S.W.2d at 401); *see also Firestone Textile Co. Div. v. Meadows, Ky.*, 666 S.W.2d 730, 732 (Ky. 1984). "The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact." *Osborn*, 2008 WL 974578, at *3 (quoting *Grzyb*, 700 S.W.2d at 401). Watts argues he was discharged in violation of Title VII. (Docket No. 58, at 45.) In Part I, *supra*, the Court found that Watts' Title VII claim could not

withstand summary judgment. As such, the public policy exception to Kentucky's at-will doctrine is inapplicable.

Having found that Watts was an at-will employee and that no public policy exception applies, the Court finds, as a matter of law, that there was no breach of contract by the Ambulance Service.[2] Accordingly, Defendants are entitled to summary judgment on Watts' breach of contract claim.

## IV. Slander

Watts alleges that Murphy and Gilland slandered him after his employment. The essential elements of defamation in Kentucky are "(1) defamatory language; (2) about the plaintiff; (3) which is published; and (4) which causes injury to reputation." *Dennison v. Murray State Univ.*, 465 F. Supp. 2d 733, 749 (W.D. Ky. 2006) (citing *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981)). Truth is a complete defense; thus, a defendant who can prove the truth of the alleged defamatory statement cannot be liable for slander. *Id.* (citing *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795-96 (Ky. 2004)). And where the plaintiff is a public figure, he must show that the defendant made the defamatory statement with "actual malice"—"that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 689 (Ky. 1990) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

Defendants argue that Watts was a public figure as the Director of a public, political subdivision of the Commonwealth. Watts does not appear to contest this point in his Response; indeed, he specifically alleges that Murphy and Gilland acted

---

[2] Defendants present several additional reasons in support of summary judgment on Watts' breach of contract claim. Because the Court finds that Watts was terminable at will and that Defendants breached no contract of employment, these alternative arguments need not be addressed.

"intentionally, maliciously, [and] with reckless disregard for the truth." (Docket No. 58, at 46.)

### A. Slander Claim Against Murphy

Watts' slander claim against Murphy is based upon the statements made by Murphy to the *Herald Ledger* newspaper. This claim fails for several reasons. Most importantly, Watts effectively conceded in his deposition that nothing appearing in the *Herald Ledger* article was untrue:

> Q. . . . Was there anything to your mind as you sit here that specifically sticks out as being false?
>
> A. Not specifically to my mind.

(Docket No. 54-5, at 37.) Moreover, Watts has not shown that any statement made by Murphy was made with either knowledge that it was false or reckless disregard whether it was false or not. Thus, he has failed to show actual malice. Additionally, despite summarily claiming in his Response that he "has suffered damage to his reputation, embarrassment, and ridicule," (Docket No. 58, at 46), he offers no evidence of injury to his reputation. For these reasons, his slander claim against Murphy cannot withstand summary judgment.

### B. Slander Claims Against Gilland

Watts' slander claims against Gilland are based on statements allegedly made by Gilland to Smith, the Lyon County Emergency Management Deputy Director, and Ritchie, a local firefighter. These claims also fail.

As for Ritchie, Watts offers no proof as to the statements Gilland allegedly made to Ritchie. Ritchie has not been deposed, nor does any sworn statement by Ritchie

appear in the record. Gilland, in his affidavit, denies making the alleged statements to Ritchie. (Docket No. 54-4, at 3.) Accordingly, this claim cannot survive summary judgment.

As for Smith, Watts offers Smith's affidavit, in which Smith states, "Gilland said something to the effect of 'I don't know but I have been told that there may be some sexual harassment charges brought against Kenny Watts.'" (Docket No. 58-11, at 2.) Gilland denies telling Smith that any Ambulance Service employees were planning on bringing sexual harassment charges against Watts. (Docket No. 54-5, at 3.) This claim fails for several reasons. For one, the Court doubts whether the single equivocal ("I don't know but I have been told"), imprecise ("Gilland said something to the effect of"), and conjectural ("there may be some sexual harassment charges brought") statement Smith says Gilland made even amounts to defamatory language. But even assuming it does, Watts has not shown that this statement was made with either knowledge that it was false or reckless disregard whether it was false or not. Furthermore, he offers no evidence to show that any such statement actually injured his reputation. For these reasons, this claims also cannot withstand summary judgment.

## V.    Civil Conspiracy

Watts claims that Murphy, "possibly with assistance from other defendants," contacted Mink-Taylor and Maki for the purpose of fabricating false sexual harassment claims in order to justify terminating him. (Docket No. 58, at 46.) He also claims that Murphy, again possibly with assistance from the other Defendants, contacted Adams, the former Director of the Ambulance Service, and Simmons, the 911 Billing employee, also for the purpose of fabricating false sexual harassment claims against him. (Docket

No. 58, at 47.)  Finally, he claims that Murphy and Gilland conspired to defame him.

(Docket No. 58.)  Watts does not discuss or cite any applicable case law on civil

conspiracy in his Response; instead, he summarily argues that Murphy and/or other

Defendants conspired against him.

Kentucky law recognizes the tort of civil conspiracy.  *Fastenal Co. v. Crawford*,

609 F. Supp. 2d 650, 662 (E.D. Ky. 2009) (citing *Montgomery v. Milam*, 910 S.W.2d

237, 239 (Ky. 1995)).    To establish a claim of civil conspiracy, a plaintiff must prove

"a corrupt or unlawful combination or agreement between two or more persons to do by

concert of action an unlawful act, or to do a lawful act by unlawful means." *Peoples

Bank of N. Ky., Inc. v. Crowe Chizek & Co.*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008)

(quoting *Smith v. Bd. of Educ. of Ludlow, Ky.*, 94 S.W.2d 321, 325 (Ky. 1936)).

"A conspiracy is inherently difficult to prove. Notwithstanding that difficulty, the

burden is on the party alleging that a conspiracy exists to establish each and every

element of the claim in order to prevail." *James v. Wilson*, 95 S.W.3d 875, 896 (Ky. Ct.

App. 2002) (citing *Krauss Wills Co. v. Publishers Printing Co.*, 390 S.W.2d 132, 134

(Ky. 1965)).  "In Kentucky,  'civil conspiracy is not a free-standing claim; rather, it

merely provides a theory under which a plaintiff may recover from multiple defendants

for an underlying tort.'" *Christian Cnty. Clerk ex rel. Kem v. Mortg. Elec. Registration

Sys., Inc.*, 515 F. App'x 451, 458-59 (6th Cir. 2013) (quoting *Stonestreet Farm, LLC v.

Buckram Oak Holdings, N.V.*, 2010 WL 2696278, at *13 (Ky. Ct. App. July 9, 2010);

*see also Hogan v. Goodrich Corp.*, 2006 WL 149011, at *5 (W.D. Ky. Jan. 17, 2006)

("To support a civil conspiracy claim, some underlying tortious act must be taken.").

Thus, a civil conspiracy claim that has no tort to be based upon "cannot survive as a matter of law." *Stonestreet Farm*, 2010 WL 2696278, at *5.

Each of Watts' conspiracy theories fails. Several can be dealt with without prolonged discussion. First, Watts' theory that Murphy and Gilland conspired to defame him fails because, for the reasons discussed in Part IV, *supra*, there is no underlying defamation claim upon which to base a civil conspiracy claim. Second, his allegations that Murphy and/or other Defendants conspired with Adams or Simmons are wholly without factual support. These claims rest solely on Watts' speculative and often sensationalist interpretation of Murphy's phone records and the nature of his relationship with Simmons. As such, these theories are without merit and cannot survive summary judgment.

Watts' conspiracy claim relative to Mink-Taylor fails for similar reasons. Watts surmises that Murphy conspired with Mink-Taylor to levee false sexual harassment charges against him.[3] Both Murphy and Mink-Taylor deny that any such conversation took place. (*See* Docket Nos. 54-3, at 4; 54-6, at 12; 58-7, at 6-7, 11.) Aside from his own conjectures, there is no evidence that Murphy and Mink-Taylor entered into any unlawful agreement. And despite Watts' insistence that Mink-Taylor agreed to make

---

[3] Watts seems to concede in his deposition that he has no evidence to support this claim:

> Q. Okay. When you make the allegation that [Murphy] contacted Sara Mink-Taylor, what evidence do you have that that happened?
>
> A. At this present time, I -- I don't have evidence other than the record that will show that she went back to work after I was fired.
> . . . .
> Q. Okay. But again, you haven't talked with Sara Mink-Taylor, and you don't know when, if ever, she actually did have this conversation with Rod Murphy, correct?
>
> A. Correct.

(Docket No. 54-5, at 33, 36.)

false sexual harassment claims against him, there is no evidence that any such claims were ever filed. Thus, the Court fails to see the overt act in furtherance of the alleged conspiracy. Moreover, for the reasons discussed elsewhere in this Opinion, there simply is no underlying tort on which to base Watts' civil conspiracy claim. Summary judgment is therefore warranted on this theory as well.

Finally, Watts claims that Murphy and/or other Defendants conspired to contact Maki with the intention of fabricating a false sexual harassment claim against him. The sole evidentiary basis for this claim is Maki's testimony. Despite the fact that Maki's testimony is riddled with inconsistent statements about who called whom and how many times she called Murphy, this evidence is insufficient to establish a viable conspiracy claim. First, there is no concert of action between or among Murphy and any other Defendant. Even assuming that Murphy did solicit Maki to make false sexual harassment claims against Watts, it is undisputed that Maki refused. Thus, other than Watts' conclusory allegations to the contrary, there is no evidence that Murphy and any other Defendant participated together in any act in furtherance of the alleged conspiracy. Second, again for the reasons discussed elsewhere in this Opinion, there is no underlying tort on which to base this conspiracy claim. For these reasons, this theory also cannot survive summary judgment.

## VI. Tortious Interference With a Contract

Watts alleges that Murphy, acting alone or in concert with the other Defendants, "intentionally, unlawfully, and without privilege interfered with Plaintiff's contract of employment." (Docket No. 58.) In support of this claim, Watts does little more than

rehash his allegations relative to Murphy's phone conversation with Maki. (*See* Docket No. 58, at 49-52.)

Kentucky law is clear that a tortious interference claim requires interference and improper conduct by a third party—that is, a party or its agent cannot interfere with that party's own contract. *See Harstad v. Whiteman*, 338 S.W.3d 804, 814 (Ky. Ct. App. 2011) ("Agents of a party to a contract . . . cannot interfere with that party's contract."); *see also AMC of Louisville, Inc. v. Cincinnati Milacron Inc.*, 2000 WL 33975582, at *5 (W.D. Ky. Jan. 25, 2000) ("Kentucky's courts have not recognized a claim against a Defendant for interfering with its own contract . . . ."). It is undisputed that Watts was employed by the Ambulance Service Board. It also is undisputed that Murphy was the Board's chairman and Defendants Young, Gilland, Denney, and Sims were members of the Board. As such, Murphy and the other Defendants clearly were agents of the Board, the party to Watts' claimed contract of employment. It follows that Defendants could not have tortiously interfered with any contract between Watts and the Board. Thus, no claim for tortious interference exists.

## VII. Wrongful Discharge in Violation of Public Policy

For this claim, Watts alleges that he was wrongfully terminated in violation of public policy. To the extent the basis for this claim is the same as that for his Title VII and KCRA claims, it is preempted and subsumed by those more specific laws. *See Spagnola v. Humana, Inc.*, 2010 WL 59250, at *9 (W.D. Ky. Jan. 6, 2010) (discussing *Grzyb*, 700 S.W.2d at 401; *Wilson v. Lowe's Home Ctr.*, 75 S.W.3d 229, 239 (Ky. Ct. App. 2001)). To the extent Watts bases this claim on "his reporting of potential HIPAA violations," (*see* Docket No. 58, at 53), this theory already has been considered and

rejected in the Court's prior Opinion addressing Defendants' motion to dismiss. (*See* Docket No. 26, at 18-20). To the extent this claim is based on his civil conspiracy allegations, those issues have been addressed *supra* Part V and need not be discussed further. Accordingly, this claim cannot withstand summary judgment.

## VIII. Outrage / Intentional Infliction of Emotional Distress

For his final two claims, Watts alleges that the conduct of Defendants, as a group, and of Murphy, individually, concerning his termination, alleged violation of his civil rights, and alleged slander was intentional and/or reckless. Kentucky considers the tort of outrage, or IIED, to be a "gap filler." *Farmer v. Dollar Gen. Corp.*, 2012 WL 4364108, at *7 (W.D. Ky. Sept. 24, 2012) (citing *Rigazzio v. Archdiocese of Louisville*, 853 S.W.2d 295, 298–99 (Ky. Ct. App. 1993)). As such, a plaintiff cannot proceed on an IIED claim where the alleged conduct makes out a claim for another tort for which emotional distress damages would be available. *Id.*; *see Grace v. Armstrong Coal Co., Inc.*, 2009 WL 366239 at *3–4 (W.D. Ky. Feb. 13, 1999) (dismissing IIED claim where claims for defamation and wrongful discharge provided for emotional distress damages).

Watts' claim against the Defendants as a group is preempted by his Title VII and KCRA claims because the basis for his IIED claim is the same as for his claims under Title VII and the KCRA. *See, e.g.*, *Bogle v. Luvata Franklin, Inc.*, 2013 WL 1310753, at *2 (W.D. Ky. Mar. 28, 2013) ("Kentucky courts have consistently held that where a plaintiff pursues relief under the Kentucky Civil Rights Act, a claim of IIED based on the same employer conduct is barred."); *Wiseman v. Whayne Supply Co.*, 359 F. Supp. 2d 579, 592 (W.D. Ky. Jan. 12, 2004) (dismissing a plaintiff's IIED claim because the

KCRA preempts it by providing damages for humiliation and person indignity as would a claim for IIED); *Kroger Co. v. Buckley*, 113 S.W.3d 644, 646-47 (Ky. Ct. App. 2003) ("[W]hen a plaintiff prosecutes a KRS Chapter 344 claim and an outrageous conduct claim concurrently, the former preempts the latter. . . . [A] KRS Chapter 344 claim preempts a common law IIED/outrageous conduct claim."); *Wilson v. Lowe's Home Ctr.*, 75 S.W.3d 229, 239 (Ky. Ct. App. 2001) (holding that a plaintiff's "IIED claim against [his employer] was subsumed by his KRS Chapter 344 claims"). Therefore, Watts' group outrage/IIED claim arising out of the same events and conduct as his Title VII and KCRA claims is preempted and must be dismissed.

Though not adequately addressed by either party, it is worth considering separately whether Watts' IIED claim against Murphy, individually, is also preempted. This Court previously has noted that the KCRA "only 'subsumes' outrageous behavior claims against employers, not individuals." *Farmer*, 2012 WL 4364108, at *7 (quoting *Hanley v. Chevy Chaser Magazine, LLC*, 199 F. App'x 425, 432 (6th Cir. 2006)). *Farmer* relied on the Sixth Circuit's decision in *Hanley*, which itself relied on the Kentucky Court of Appeals' decision in *Wilson*. There, the Kentucky appellate court concluded that the fact that a civil rights claim may be filed against an employer does not prohibit the filing of an IIED claim against the offending individuals against whom no civil rights claim could have been filed. *Wilson*, 75 S.W.3d at 239. In this case, Watts could have and did file civil rights claims against Murphy. As the Court found at the outset of its discussion *supra* Part I, Murphy meets the statutory definition for an "employer" and, therefore, could be subject to liability under Title VII (and by extension, the KCRA). Consequently, this case is distinguishable from *Farmer* and

*Hanley* insofar as here, Watts' individual IIED claim against Murphy is likewise preempted by his Title VII and KCRA claims.

But even assuming it were not, Murphy would still be entitled to summary judgment. To maintain an IIED claim in Kentucky, a plaintiff must show (1) that the defendant's conduct was "'intentional or reckless,'" (2) that his conduct was "so 'outrageous and intolerable' that it offends 'generally accepted standards of decency and morality,'" and (3) that his conduct "cause[d] severe emotional distress in the victim." *Hanley*, 199 F. App'x at 431 (quoting *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 2-3 (Ky. 1990)). Watts' claim against Murphy does not satisfy the high threshold for IIED claims. As a matter of law, Murphy's alleged conduct does not come close to the level of "atrocious and utterly intolerable" conduct required to satisfy the second element. *Hanley*, 199 F. App'x at 432 (quoting *Wathen*, 115 F.3d at 407). Nor has Watts shown that Murphy's alleged conduct caused him severe emotional distress. In short, he has offered no proof of emotional distress whatsoever. Watts testified in his deposition that since his termination he has suffered no worsening of his physical condition; has sought no treatment for anxiety, depression, or any type of mental illness; has sought no treatment for the increased stress he claims to suffer; and has no appointments scheduled with any medical provider for any physical or mental condition relating to this lawsuit. (Docket No. 54-5, at 22-24.) For these reasons also, summary judgment is appropriate as to Watts' claims of outrage and IIED.

## CONCLUSION

Therefore, having considered the parties' respective arguments, for the foregoing reasons, the Court will GRANT Defendants' Motion for Summary Judgment and enter judgment in their favor as to all of Watts' remaining claims. A separate Judgment will enter concurrently with this Opinion.

Date:

cc:     Counsel